CARTWRIGHT v MACCABEES MUTUAL LIFE INSURANCE
COMPANY

(ESTATE OF CARTWRIGHT v MACCABEES MUTUAL
LIFE INSURANCE COMPANY)

OPINION OF THE COURT

1. EVIDENCE—PHYSICIANS AND SURGEONS—TRANSCRIPT—INSURANCE
—PHYSICIAN-PATIENT PRIVILEGE.

A transcript of an oral report made by a doctor who had treated
the deceased was improperly admitted in evidence in an action
filed to recover the proceeds of an insurance policy that was
never issued where the administratrix of the estate objected on
the grounds of the physician-patient privilege; reversible error
resulted (MCLA 600.2157).

2. EVIDENCE—PHYSICIANS AND SURGEONS—PHYSICIAN-PATIENT PRIVI-
LEGE.

There is no support for the view that the statutory privilege of
information between physician-patient applies only where a
party seeks to introduce into evidence the doctor's statement as
substantive evidence of the matters contained therein (MCLA
600.2157).

3. EVIDENCE—PHYSICIANS AND SURGEONS—PHYSICIAN-PATIENT PRIVI-
LEGE—IMPEACHMENT—REFRESHING RECOLLECTION—DISCOVERY—
REBUTTAL—HYPOTHETICAL QUESTIONS—OPINION TESTIMONY—IN-
COMPETENCE—MEDICAL CONDITION.

The statute regarding the physician-patient privilege bars the use
of privileged information for impeachment, for purposes of
refreshing a witness's recollection, for discovery purposes, and

REFERENCES FOR POINTS IN HEADNOTES

[1, 7, 11, 12] 58 Am Jur, Witnesses § 420.
[2–5] 58 Am Jur, Witnesses § 411 *et seq.*
[6] 58 Am Jur, Witnesses § 437 *et seq.*
[8] 44 Am Jur 2d, Insurance § 1460.
[9] 43 Am Jur 2d, Insurance §§ 210–212.
[10] 44 Am Jur 2d, Insurance §§ 1985, 1986.
[13] 44 Am Jur 2d, Insurance §§ 2062, 2063, 2068, 2076, 2079, 2080.

for purposes of rebutting a claim of insanity; the privileged information cannot be used as the basis for hypothetical questions, or for purposes of eliciting opinion testimony, or to show the testimonial incompetence of a witness, and the statute precludes the use of privileged information to show the medical condition of a party (MCLA 600.2157).

4. PHYSICIANS AND SURGEONS—PHYSICIAN-PATIENT PRIVILEGE—CONSTRUCTION.

The statutory privilege of information between physician and patient has been broadly construed (MCLA 600.2157).

5. PHYSICIANS AND SURGEONS—PHYSICIAN-PATIENT PRIVILEGE—QUASI-JUDICIAL PROCEEDINGS.

The physician-patient privilege bars a doctor from divulging what he has been told by his patient or revealing information he may have received in the course of treatment and it extends to judicial and quasi-judicial proceedings alike (MCLA 600.2157).

6. EVIDENCE—PHYSICIANS AND SURGEONS—MEDICAL AUTHORIZATION —WAIVER—PHYSICIAN-PATIENT PRIVILEGE.

A deceased's authorization to a physician to give to an insurance company any information requested concerning present and past physical condition does not constitute a waiver of the right at trial to invoke the physician-patient privilege (MCLA 600.2157).

7. EVIDENCE—PHYSICIANS AND SURGEONS—TRANSCRIPT—INSURANCE.

Admission in evidence of a transcript of an oral report made by a doctor who had treated the deceased was reversible error in an action brought by the administratrix of the estate of the deceased to recover the proceeds of an insurance policy that was never issued where the exhibit may have been determinative as to whether the deceased was insurable (MCLA 600.2157).

8. INSURANCE—PROMPTNESS—INITIAL PREMIUM—UNREASONABLE DELAY—NOTICE—JURY QUESTION.

An insurance company has an affirmative duty to act with reasonable promptness where it accepts an initial premium at the same time it accepts the application for insurance and retains that initial premium during processing, and where there was factual support for a plaintiff's claim that the insurance company unreasonably delayed it's notification of acceptance or rejection, the court erred in taking this issue from the jury.

9. Insurance—Acceptance of Applications—Question of Law—
Question of Fact—Directed Verdict.

It should not be said that an insurer acted with reasonable
promptness as a matter of law where there was a delay of 73
days between application for an insurance policy and formal
action by the insurer; that was a question of fact for the trier of
fact because reasonable men could honestly reach a different
conclusion and therefore as to this issue a directed verdict was
inappropriate.

10. Insurance—Fraud—Jury—Estoppel—Question of Fact.

The defense of fraud in an application for insurance was properly
submitted to the jury in an action to recover the proceeds of an
insurance policy that was never issued and the defendant
insurance company was not estopped from asserting that de-
fense, where it properly presented factual questions for jury
determination.

Dissent by Quinn, J.

11. Evidence—Insurance—Physicians and Surgeons—Transcript
—Good Faith—Physician-Patient Privilege—Waiver—Medi-
cal Authorization.

The admission of a transcript of an oral report by a doctor in an
action to recover the proceeds of an insurance policy that was
never issued for purposes of proof that defendant acted in good
faith in denying the application and not for the purposes of
establishing the truth of the matter contained in the transcript
was not erroneous; the physician-patient privilege was waived
when the deceased executed a medical authorization (MCLA ·
600.2157).

12. Evidence—Insurance—Transcript—Physicians and Surgeons
—Harmless Error.

The admission of a transcript of an oral report by a doctor in an
action to recover the proceeds of an insurance policy that was
never issued was harmless error where the transcript merely
corroborated a fact independently established.

13. Insurance—Unreasonable Delay—Question of Law.

A trial court properly took from the jury the question of unrea-
sonable delay on the part of an insurance company in rejecting
an application for an insurance policy where the record estab-
lishes no unreasonable delay since the delay was caused by a
doctor's refusal to comply with a request for information which

*the deceased had authorized defendant to obtain; there was no unreasonable delay as a matter of law.*

Appeal from Wayne, George E. Wicklund, J. Submitted June 16, 1975, at Detroit. (Docket No. 20575.) Decided November 24, 1975. Leave to appeal applied for.

Complaint by Margie Cartwright, for herself and as administratrix of the estate of Clayton Cartwright, deceased, against Maccabees Mutual Life Insurance Company for recovery of proceeds under a life insurance policy which was never issued. Judgment for defendant. Plaintiff appeals. Reversed and remanded.

*Kelman, Loria, Downing, Schneider & Simpson,* for plaintiff.

*Honigman, Miller, Schwartz & Cohn* (by *James K. Robinson),* for defendant.

Before: T. M. BURNS, P. J., and QUINN and M. J. KELLY, JJ.

M. J. KELLY, J. This action was filed to recover the proceeds of an insurance policy that was never issued. The action was based on a conditional receipt given by the agent at the time the application for insurance was filed and an advance premium paid. The jury verdict was no cause of action. Judgment was entered thereon and plaintiff appeals.

On November 4, 1969, defendant's agent solicited a life insurance application from Clayton J. Cartwright and his wife, Margie L. Cartwright, at their home. The Cartwrights signed an application for insurance with defendant, seeking a $20,000 face amount joint life insurance policy on their lives, and a term insurance policy on the lives of

their children. The application consisted of two
parts and contained a number of questions di-
rected to Mr. and Mrs. Cartwright. Mrs. Cart-
wright testified she was asked only two questions:
(1) whether she was pregnant, and (2) when she
had last seen a doctor. Mr. Cartwright answered
the questions pertaining to him. Immediately
above the signatures of Mr. and Mrs. Cartwright
on Part I of the application appears the following
language:

"IT IS UNDERSTOOD AND AGREED (1) that the
above statements and answers and those in any Part II
and III required are complete and true to the best of
my knowledge and belief and shall, together with this
agreement, form the basis and become a part of any
policy issued hereunder; (2) that except as otherwise
provided in the attached receipt, the insurance hereun-
der applied for shall not take effect until a policy
therefor is accepted by the owner and the first premium
paid while the undersigned have no knowledge that the
health, habits and occupation of the proposed insured,
family member or second insured have not remained as
described in the application; (3) that, to the extent
permitted by statute, the proposed insured, family
member or second insured waive(s) all rights governing
disclosure of medical examination or treatment * * * ."

Immediately above the signatures of Mr. and
Mrs. Cartwright on Part II of the application
appears the following language:

"I hereby declare that all the statements and answers
to the above questions are complete and true to the best
of my knowledge and belief, and I agree that the
foregoing together with this declaration shall form a
part, designated as Part II, of the application for the
insurance."

Contemporaneously with the completion of the

application, Mr. and Mrs. Cartwright both signed medical authorizations as follows:

"TO ANY PHYSICIAN, HOSPITAL OR CLINIC: I hereby request and authorize you to give MACCABEES MUTUAL LIFE INSURANCE COMPANY any information they request concerning the present and past physical condition of myself, my spouse, and any of my children. A photostatic copy hereof shall be as valid as the original."

At the time of the application, an advance premium of $170.49 was paid with respect to the insurance applied for, and a conditional receipt was delivered to the Cartwrights. The relevant part of that receipt reads as follows:

"[I]f the Company at its Home Office shall be satisfied that on the latest of the dates of the completed Part I, Part II (if required), and Part III (if required) of the application, any of the individuals to be insured are insurable under the Company's rules of that date, whether on a standard basis or not, then, * * *

"(a) life insurance, only on the lives of the individuals who are determined by the Company to be insurable on that date, is effective as of that date; * * * .

"If the Company shall be satisfied that any individual intended to be insured is uninsurable, then no life insurance is effective as to that individual and if all are uninsurable then the Company's liability is limited to the return of the amount of advance payment."

On November 10, 1969, defendant received the application of Mr. and Mrs. Cartwright at its home office. Thereafter, the following events occurred:

1. On November 11, 1969, defendant received a report from the Medical Information Bureau showing that a Clayton J. Cartwright had been reported as having collagen disease, abnormal heart and albuminuria.

2. On November 13, 1969, defendant forwarded an attending physician's statement to Dr. Howard B. Appleman, the physician listed by Mr. Cartwright on the application, requesting medical information regarding Mr. Cartwright.

3. From November 14, 1969, to December 1, 1969, defendant had correspondence with Retail Credit Bureau regarding an erroneous entry in its November 14, 1969 report that Mr. Cartwright engaged in a "hazardous sport".

4. On December 5, 1969, defendant hand delivered another attending physician's statement to Dr. Appleman requesting medical information concerning Mr. Cartwright.

5. On December 18, 1969, Mr. Cartwright died.

6. On December 19, 1969, defendant wrote to its agent advising that defendant was still waiting for medical information from Dr. Appleman.

7. On December 23, 1969, prior to issuance or delivery of an insurance policy, defendant learned that Mr. Cartwright had died.

8. On January 6, 1970, defendant again wrote to Dr. Appleman advising him that his report was needed to permit Maccabees to determine whether Mr. Cartwright "was insurable on any basis at time of application".

9. On January 12, 1970, Dr. Appleman called defendant and gave his report. The report related a substantial medical history, including rheumatic fever, possible collagen disease and pneumonia. It further stated: "he developed a greater rash * * * in September of 69 and the thought of a possible systemic lupus erythematosus became fixed in my mind. This was the reason why I did not feel I should report the situation to the insurance company at the time I received request for informa-

tion determining my patient's eligibility for insurance."

10. January 16, 1970, defendant, having decided that Mr. Cartwright was uninsurable at the time of the application, advised Mrs. Cartwright by letter that it was unable to offer any insurance and enclosed a check for the amount of the advance premium paid.

An autopsy performed on Mr. Cartwright revealed the cause of death to be severe pneumonia in both lungs and that he did have systemic lupus erythematosus.

At trial, plaintiff's claim was based on three theories: (1) that upon proof of the payment of the premium, issuance of the conditional receipt and death prior to notification by the defendant that the decedent was rejected for insurance, plaintiff should recover; (2) that upon the above proof, if the defendant unreasonably delayed in notifying of acceptance or rejection, that plaintiff should recover; and (3) that plaintiff should recover in any event unless the defendant established that it in good faith became satisfied that Clayton Cartwright was not on November 4, 1969 insurable on any basis whatsoever.

Under defendant's underwriting rules as of November 4, 1969, a person suffering from systemic lupus erythematosus was not insurable on a standard basis or otherwise.

At trial, plaintiff offered certain exhibits which were received, read into the record responses to plaintiff's requests for admissions, and rested her case on that proof and the pleadings. Defendant then moved for a directed verdict as to all issues except insurance coverage under the conditional receipt and whether the receipt was voided by fraud in the application. This motion was granted

and the trial proceeded on that basis. Coverage under the conditional receipt was contingent on defendant proving by a preponderance of the evidence that it made a good faith effort to determine Mr. Cartwright's insurability as of the date of the application, November 4, 1969.

In support of its claim of good faith, defendant was allowed to introduce in evidence a transcript of an oral report made by Dr. Howard B. Appleman, the doctor who had treated Mr. Cartwright. This exhibit was apparently reduced to writing by defendant's vice-president, Mr. Vanderbeck, after having received a telephone call from Dr. Appleman on January 12th. The trial court admitted this exhibit over plaintiff's objection, and we believe, improperly so. Plaintiff asserted as grounds for objection the physician-patient privilege. The trial court allowed the transcript, not for the truth of the matter contained therein, but to show that it acted in good faith in denying the application for insurance of plaintiff's decedent. The privilege is set out in MCLA 600.2157; MSA 27A.2157:

"No person duly authorized to practice medicine or surgery shall be allowed to disclose any information which he may have acquired in attending any patient in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon: Provided, however, That in case such patient shall bring an action against any defendant to recover for any personal injuries, or for any malpractice, if such plaintiff shall produce any physician as a witness in his own behalf, who has treated him for such injury, or for any disease or condition, with reference to which such malpractice is alleged, he shall be deemed to have waived the privilege hereinbefore provided for, as to any or all other physicians, who may have treated him for such injuries, disease or condition: Provided further,

That after the decease of such patient, in a contest
upon the question of admitting the will of such patient
to probate, the heirs at law of such patient, whether
proponents or contestants of his will, shall be deemed to
be personal representative of such deceased patient for
the purpose of waiving the privilege hereinbefore cre-
ated."

We can find no support for the view that the
privilege applies only where a party seeks to intro-
duce the doctor's statement as substantive evi-
dence of the matters contained therein. There is
much Michigan law to the contrary. For example,
it has been held that the statute bars the use of
privileged information for impeachment,[1] for pur-
poses of refreshing a witness's recollection,[2] for
discovery purposes,[3] and for purposes of rebutting
a claim of insanity.[4] It has been held that privi-
leged information cannot be used as the basis for
hypothetical questions,[5] or for purposes of eliciting
opinion testimony,[6] or to show the testimonial
incompetence of a witness.[7] Our Court has as-
sumed that the statute precludes the use of privi-
leged information to show the medical condition of
a party.[8]

The privilege has been broadly construed. It bars
the doctor from divulging what he has been told
by his patient or revealing information he may

---

[1] *People v Bland,* 52 Mich App 649; 218 NW2d 56 (1974).

[2] *Franklin Life Insurance Co v William J Champion & Co,* 350 F2d
115, 130; 26 ALR3d 1034 (CA 6, 1965) (interpreting Michigan Law).

[3] *Schechet v Kesten,* 372 Mich 346; 126 NW2d 718 (1964).

[4] *People v Plummer,* 37 Mich App 657; 195 NW2d 328 (1972).

[5] *Knoper v Burton,* 12 Mich App 644; 163 NW2d 453 (1968), *rev'd
on other grounds,* 383 Mich 62; 173 NW2d 202 (1970).

[6] *Rose v Supreme Court, Order of Patricians,* 126 Mich 577; 85 NW
1073 (1901).

[7] *People v Lapsley,* 26 Mich App 424; 182 NW2d 601 (1970).

[8] *Mattara v Mattara,* 4 Mich App 246; 144 NW2d 668 (1966).

have received in the course of treatment.[9] It extends to judicial and quasi-judicial proceedings alike.[10] It seems to us that the focus is not upon the use to which disclosure is put. The information is out of the hat whether its use is labeled substantive evidence or not. The trial court's limitation of the use of the information did not amount to an enforcement of the statutory privilege, it amounted to an evasion. To treat the release of information as allowable for any purpose was a violation of the statute. We conclude that reversible error resulted.

Defendant concedes that Mr. Cartwright's medical authorization did not constitute a waiver of his right at trial to invoke the privilege. That concession is eminently correct in light of *Wohlfeil v Bankers Life Co,* 296 Mich 310, 320; 296 NW 269 (1941):

"The blank form of proof of loss which was signed by plaintiff contained the following: 'Do you authorize the above named [Dr. H. C. Hill] or any other physician or practitioner consulted by the deceased or by whom he was attended during the last five years and who has information regarding the personal history, physical or mental condition of the deceased, to disclose the same and testify thereto?' To this question plaintiff subscribed the answer 'Yes.' Notwithstanding this concession obtained from plaintiff, under the circumstances it was not error on the part of the trial court to sustain objections made by her to any testimony of Doctor Hill as to matters of a privileged character. The law as administered by the trial court is provided by the statute. 3 Comp. Laws 1929, § 14216 (Stat. Ann. § 27.911). It cannot be changed or frittered away in the manner attempted in this case. *Gilchrist v Mystic*

---

[9] *Briggs v Briggs,* 20 Mich 34, 41 (1870).

[10] *Dick v Supreme Body of the International Congress,* 138 Mich 372; 101 NW 564 (1904).

*Workers,* 188 Mich 466 (Ann Cas 1918C, 757) [154 NW 575 (1915)]."

Since the exhibit could not be permissibly introduced in evidence unless the privilege was waived, the only remaining question is whether the error was harmless. We believe the exhibit may have been determinative. With the exhibit in evidence, defendant could point to its reason for rejection. Without the exhibit defendant would be left with its claim of good faith unfortified except by the autopsy and the testimony of Dr. Climie, the pathologist. He was not asked to testify how long this condition existed, or whether it existed on November 4, 1969. The cause of death was pneumonia.

Secondly, we find factual support for plaintiff's claim of unreasonable delay and believe the court erred in taking this issue from the jury by way of a directed verdict as to plaintiff's theory number two.

Where the insurance company accepts an initial premium at the same time it accepts the application for insurance and retains that initial premium during processing, it has an affirmative duty to act with reasonable promptness.

"Based on the doctrine that an application for insurance is a mere offer which must be accepted before a contract of insurance can come into existence, and that silence and inaction do not amount to an acceptance of an offer, the overwhelming weight of authority is to the effect that, at least in the absence of additional circumstances, no inference or presumption of acceptance which would support an action *ex contractu* can be drawn from mere delay or inaction by the insurer in passing on the application. But there appears to be a distinction drawn where the applicant paid the initial premium at the time the application was signed. Delay in acting on the application, along with a retention of

the premium, under these circumstances is inconsistent with a rejection of the risk. Michigan has long held to this rule, it being originally established in the case of *Robinson v United States Benevolent Society,* 132 Mich 695 (102 Am St Rep 436) [95 NW 993 (1903)], where Justice GRANT, writing for the Court, said (p 699):

" 'In insurance contracts of this character it is the duty of the company to act with reasonable promptness. Failing to reject within reasonable time, the law implies an acceptance.' " *Gorham v Peerless Life Insurance Co,* 368 Mich 335, 341; 118 NW2d 306 (1962).

While the factual context is materially different in *Gorham,* there the delay between application and formal action by the insurer was 37 days. In the case at bar it should not be said that the insurer in 73 days acted with reasonable promptness as a matter of law. That is a question of fact for the trier of fact. Reasonable men, it seems to us, could honestly reach a different conclusion and therefore as to this issue a directed verdict was inappropriate. *Anderson v Gene Deming Motor Sales, Inc,* 371 Mich 223, 229; 123 NW2d 768, 771 (1963), *Sparks v Luplow,* 372 Mich 198, 202; 125 NW2d 304, 306 (1963), *Kucken v Hygrade Food Products Corp,* 51 Mich App 471, 474; 215 NW2d 772, 773 (1974). There is evidence from defendant's agency bulletin that even defendant company considered 73 days an unreasonable delay. The exhibit introduced by plaintiff reads:

"The maximum amount of time allowed for completion of a pending application will be 45 days from receipt in the home office. The maximum amount of time allowed for delivery of a prepaid policy will be 31 days."

At the time the motion for directed verdict in favor of defendant was granted as to all issues

except insurance coverage under the conditional receipt, and whether the receipt was voided by fraud in the application, evidence as to why Dr. Appleman delayed in responding to defendant's request for information was not in the record. We do not attribute Dr. Appleman's delay to one side or the other. We believe the delay could just as easily have been caused by the casual handling of the request for information by the defendant. Balanced against its own agency bulletin, a reasonable man could find that the delay was attributable to defendant's inaction. When the defendant did finally act on the application by rejecting it, it gave no reason for rejecting the children and Mrs. Cartwright as applicants. Were they being as carefully considered and accorded as reasonably prompt consideration as the application of Mr. Cartwright? The jury might well have considered this treatment in the light of testing the good faith or reasonableness of the defendant's conduct. The defendant knew on November 11, 1969 that Mr. Cartwright had a collagen disease. This information was supplied by the medical information bureau but this did not prompt any activity on the part of the defendant, such as calling for its own medical examination, and it is at least curious that the processing meandered along until the letter of January 16, 1970.

We do not find plaintiff's other claims of error meritorious. We hold that the trial court did not err in denying plaintiff's motion for a directed verdict or refusing to submit the matter to the jury on the theory that the advance payment coupled with death before determination or notification of rejection entitled plaintiff to recover. We also hold that the defense of fraud in the application was properly submitted to the jury. Defendant

was not estopped from asserting that defense; it properly presented factual questions for jury determination.

Reversed and remanded for a new trial at which the question of unreasonable delay should go to the jury and at which the transcript of the physician's statement should not be admitted into evidence absent a waiver of the physician-patient privilege. Costs to plaintiff-appellant.

T. M. Burns, P. J., concurred.

Quinn, J. *(dissenting)*. I dissent. The majority opinion holds that the transcript of the oral report by Dr. Appleman was inadmissible for any purpose, and that the medical authorization signed by Mr. Cartwright at the time of applying for insurance did not constitute a waiver of the physician-patient privilege. The majority further holds that the admission of the report was reversibly erroneous, because,

"We believe the exhibit may have been determinative. With the exhibit in evidence, defendant could point to its reason for rejection. Without the exhibit defendant would be left with its claim of good faith unfortified except by the autopsy and the testimony of Dr. Climie, the pathologist. He was not asked to testify how long this condition existed, or whether it existed on November 4, 1969. The cause of death was pneumonia."

The trial court admitted the transcript as proof that defendant acted in good faith in denying the application, not for the truth of the matter contained in the transcript. This was not error because the transcript was admissible as proof of the truth of its contents. The physician-patient privilege was waived when Mr. Cartwright executed the medical authorization.

On the basis of defendant's concession and *Wohl-feil v Bankers Life Co,* 296 Mich 310; 296 NW 269 (1941), the majority holds that there was no waiver of the physician-patient privilege. I am not bound by defendant's concession nor can I read *Wohlfeil* as holding that the medical authorization in this case of Cartwright was not a waiver. In *Wohlfeil,* the insurance was in force and the medical authorization was contained in a proof of loss statement. The use of the physician's testimony was to defeat an existing right, and the non-waiver holding is understandable. In the case before us, the authorization permits the physician to disclose information that is essential for a determination by the insurance company whether or not to issue the insurance, thereby creating the right. The effect of the majority's non-waiver holding is that the medical authorization permits the insurance company to obtain medical information it needs to determine whether or not to issue a policy of insurance but this same information cannot be used to explain why the insurance was not issued. This offends reason. If that is the law, it is further basis for the ancient saying, "The law is an ass".

Assuming error in the admission of the transcript, I consider the error harmless. The autopsy established the fact that Mr. Cartwright suffered from systemic lupus erythematosus. Webster's Third New International Dictionary, p 1347, defines the disease as,

"[A] slowly progressive systemic disease of unknown origin marked by degenerative changes of collagenous tissues with erythematous skin lesions, arthritic changes, lesions of internal organs, and wasting and by fever, leukemia, and endocarditis."

It was not a disease that Mr. Cartwright developed

the day he died. Dr. Appleman's transcript merely corroborated a fact independently established.

Finally, the majority finds error in taking from the jury the question of unreasonable delay because the proofs at the time of the motion for directed verdict indicated a fact question for jury determination. I cannot agree with this analysis. Our review covers the whole record, *Mitcham v Detroit,* 355 Mich 182, 192; 94 NW2d 388, 394 (1959). That record discloses that the delay was caused by Dr. Appleman's refusal to comply with defendant's request for information which Mr. Cartwright had authorized defendant to obtain. To me, as a matter of law, that record establishes no unreasonable delay.

Affirmed with costs to defendant.