CARTWRIGHT v MACCABEES MUTUAL LIFE INSURANCE
COMPANY

Docket No. 58004. Argued November 4, 1976 (Calendar No. 4).—
Decided December 7, 1976.

Margie Cartwright, as administratrix of the estate of Clayton
Cartwright, deceased, and for herself, brought an action against
Maccabees Mutual Life Insurance Company for recovery of
proceeds under a life insurance policy which was never issued.
The Cartwrights signed an application for the policy with the
defendant, answered questions to the effect that Mr. Cartwright
was in good health, paid an advance premium, and were issued
a conditional receipt providing that a policy of insurance would
be issued effective on the date of application for any of the
applicants who were insurable. The defendant received infor-
mation showing that Mr. Cartwright was not in good health
and returned the advance premium and notified the plaintiff
that her husband, who had died in the meantime of pneumo-
nia, would not be insurable. A jury in Wayne Circuit Court,
George E. Wicklund, J., gave a verdict for the defendant. The
Court of Appeals, T. M. Burns, P. J., and M. J. Kelly, J. (Quinn,
J., dissenting), reversed on the grounds that admission of a
report by Mr. Cartwright's physician into evidence over asser-
tion of the physician-patient privilege was error, and that the
trial court erred in granting the defendant a directed verdict
on the issue of whether the application had been accepted by
unreasonable delay (Docket No. 20575). Defendant appeals.
*Held:*

1. Acceptance of an application for a policy of insurance on
the part of the insurer, may be implied where the insurer
accepts and retains an advance premium while delaying action
on the application under circumstances inconsistent with rejec-

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 43 Am Jur 2d, Insurance § 214.
Rights and remedies arising out of delay in passing upon applica-
tion for insurance. 32 ALR2d 487.
[4–6] 43 Am Jur 2d, Insurance § 734 *et seq.*
Temporary life, accident, or health insurance pending approval of
application or issuance of policy. 2 ALR2d 943.

tion of the risk. However, the record is uncontradicted that any delay in processing the application was solely attributable to the avoidance by the proposed insured's attending physician of repeated requests by the defendant for medical information after the defendant received information the day following receipt of the application that Mr. Cartwright had collagen disease, abnormal heart, and albuminuria. On the facts of this case, reasonable minds could not differ on the conclusion that defendant's actions did not constitute unreasonable delay.

2. Inclusion of the time period subsequent to Cartwright's death in calculating the period of delay between the application and rejection was erroneous since there could have been no detrimental reliance or prejudice from any delay in processing the application after the death of the proposed insured.

3. The insurer in this case introduced substantial evidence of specific and grossly inaccurate representations in the application. There can be no disagreement among reasonable men that these false statements as to the state of Mr. Cartwright's health would materially affect the acceptance of the risk by the defendant on a policy of life insurance. Furthermore, the statements are presumed material under The Insurance Code by reason of the plaintiff's invocation of the physician-patient privilege to prevent full disclosure to the jury of the extent of Mr. Cartwright's medical impairment. Here, the jury's verdict might well have been directed upon the defendant's motion which was timely made.

Reversed and judgment for defendant reinstated.

65 Mich App 670; 238 NW2d 368 (1975) reversed.

1. INSURANCE—APPLICATION—ACCEPTANCE—UNREASONABLE DELAY.

Acceptance of an application for a policy of insurance on the part of the insurer may be implied where the insurer accepts and retains an advance premium while delaying action on the application under circumstances inconsistent with rejection of the risk.

2. INSURANCE—APPLICATION—ACCEPTANCE—UNREASONABLE DELAY.

Inclusion of the time period subsequent to the death of an applicant for a policy of life insurance to determine whether there was an unreasonable period of delay between the application and rejection was erroneous because there could have been no detrimental reliance or prejudice from any delay in processing the application after the death of the proposed insured.

3. INSURANCE—APPLICATION—ACCEPTANCE—UNREASONABLE DELAY.

Reasonable minds could not differ on the conclusion that an

insurance company's action did not constitute an unreasonable delay in acting on an application for a policy of life insurance where any delay in processing the application was solely attributable to the avoidance by the proposed insured's attending physician of repeated requests by the insurance company for medical information after its receipt of information that the proposed insured had collagen disease, abnormal heart, and albuminuria and the proposed insured had alleged in his application that he was in good health.

4. INSURANCE—APPLICATION—FALSE STATEMENTS.

A misrepresentation made by an applicant for life insurance must materially affect the acceptance of the risk to void a policy of life insurance on that basis (MCL 500.2218; MSA 24.12218).

5. INSURANCE—APPLICATION—FALSE STATEMENTS—MATERIALITY.

Statements by an applicant for life insurance that he had not "been declined, postponed or rated up for life insurance" within the previous 18 months; had never had arthritis; had not been in a hospital for diagnosis or treatment, or had undergone X-rays or electrocardiograms; and had no known indication of physical disease, defect, or disorder not disclosed by his other statements in the application, when in fact he had been declined for life insurance, had had arthritis, had been in a hospital for diagnosis or treatment, and had been treated 150 times in 5 years, would materially affect the acceptance of the risk by the defendant, and therefore bar the right to recover on an insurance policy issued on the basis of those statements (MCL 500.2218; MSA 24.12218).

6. INSURANCE—APPLICATION—FALSE STATEMENTS—MATERIALITY—PRESUMPTIONS.

False statements made in an application for a policy of life insurance are presumed under The Insurance Code to have been material misrepresentations by reason of a plaintiff's invocation of the physician-patient privilege to prevent full disclosure to the jury of the extent of the medical impairment of the applicant in a suit to recover proceeds of the policy of insurance (MCL 500.2218[4]; MSA 24.12218[4]).

*Kelman, Loria, Downing, Schneider & Simpson* for plaintiff.

*Honigman, Miller, Schwartz & Cohn* (by *James K. Robinson)* for defendant.

FITZGERALD, J. Plaintiff brought this action to recover life insurance proceeds in the amount of $20,000, based upon a conditional receipt[1] given by defendant's agent when the policy was applied for and an advance premium of $170.79 was paid. The insured, plaintiff's husband, died 44 days after making application and before issuance of any policy by defendant Maccabees. The case was tried to a jury which rendered a verdict in favor of defendant of no cause of action. The Court of Appeals, at 65 Mich App 670; 238 NW2d 368 (1975), reversed and remanded for new trial, finding that a treating physician's report had been erroneously admitted into evidence over assertion by plaintiff of the physician-patient privilege.[2] The Court of Appeals further held that the trial court erred in removing from the jury's consideration plaintiff's claim that she was entitled to the proceeds on the theory that defendant had delayed unreasonably in processing the application.

We granted leave, 396 Mich 855 (1976), principally to consider whether the privilege may be successfully invoked to prevent full disclosure of the nature of an insured's medical impairment,

---

[1] The relevant part of that receipt reads as follows:

"[I]f the Company at its Home Office shall be satisfied that on the latest of the dates of the completed Part I, Part II (if required), and Part III (if required) of the application, any of the individuals to be insured are insurable under the Company's rules of that date, whether on a standard basis or not, then, * * *

"(a) life insurance, only on the lives of the individuals who are determined by the Company to be insurable on that date, is effective as of that date; * * *

"If the Company shall be satisfied that any individual intended to be insured is uninsurable, then no life insurance is effective as to that individual and if all are uninsurable then the Company's liability is limited to the return of the amount of advance payment."

[2] MCLA 600.2157; MSA 27A.2157.

once the insurer has proved specific and false representations in the application for insurance. It is our opinion that the Court of Appeals must be reversed and that judgment enter in favor of defendant Maccabees.

## FACTS

On November 4, 1969, Clayton J. Cartwright and his wife, Margie, made written application to defendant for a $20,000 joint life policy on their lives, and a term policy on the lives of their children. Each signed the application form immediately beneath the declaration which in part stated:

"IT IS UNDERSTOOD AND AGREED (1) that the above statements and answers and those in any Part II and III required are complete and true to the best of my knowledge and belief and shall, together with this agreement, form the basis and become a part of any policy issued hereunder."

In regard to Mr. Cartwright, a "no" answer was checked in response to a question of whether he had within the past 18 months "been declined, postponed, or rated up for life insurance". In point of fact, some seven months before, on April 2, 1969, he had been declined by the Security-Connecticut Life Insurance Company for a $100,000 life policy. Furthermore, his application to Security-Connecticut revealed that insurance had also been declined in 1966.

In response to a question of whether any proposed insured had ever had "rheumatism, gout, arthritis, or any disease or disorder of muscles, bones, or joints", a "no" answer was checked. In fact, the application to Security-Connecticut refers

to a history of arthritis leading to a ten-day hospital stay in 1965 and to regular X-ray therapy. Questions regarding whether any proposed insured had been in a hospital for diagnosis or treatment, or had undergone X-rays or electrocardiograms were answered "no". In fact, Mr. Cartwright had been in Burton Mercy Hospital for diagnosis and tests, including X-rays and electrocardiograms, from January 11 to January 20, 1967, and again from January 30 to February 6, 1967. Evidence concerning the nature of treatment at Burton was excluded upon claim of privilege.

In response to a question of whether any proposed insured had any known indication of physical disease, defect or disorder not disclosed in other answers to the application, a "no" answer was checked. In fact, Mr. Cartwright had been treated 31 times in 1965 by Dr. Germany Bennett, 52 times in 1966, twice in 1967 prior to admission to the hospital and three times after discharge. Evidence pertaining to the nature of treatment by Dr. Bennett was excluded at trial upon claim of privilege. The record further reveals that Mr. Cartwright was treated 31 times by Dr. Howard Appleman in 1967, 13 times in 1968, and 18 times in 1969 before being admitted to the hospital where he died on December 18. Again, testimony regarding the nature of Dr. Appleman's treatments was excluded upon claim of privilege.

At trial, Mrs. Cartwright testified that the application was filled out on November 4 in her home while she was busy preparing dinner. She testified that her husband and defendant's agent, Donald McCray, sat at the table together and that she was unable to hear what transpired between them. According to her trial testimony, the agent asked her only whether she was pregnant and when she

had last seen a doctor. In her earlier deposition, however, Mrs. Cartwright testified:

"*Question:* Did he ask you a number of questions concerning the application?

"*Answer:* Yes, he did.

"*Question:* And what did you and your husband explain to him?

"*Answer:* Well, the questions that were pertaining to me, I answered them, and the ones that were pertaining to my husband, he answered them."

At the time of trial, the agent was no longer in defendant's employ and attempts by both sides to subpoena him were unsuccessful.

Regarding privilege, the application stated that "to the extent permitted by statute, the proposed insured, family member or second insured waive(s) all rights governing disclosure of medical examination or treatment". The Cartwrights also signed a separate waiver directed to "ANY PHYSICIAN, HOSPITAL OR CLINIC" which stated that: "I hereby request and authorize you to give MACCABEES MUTUAL LIFE INSURANCE COMPANY any information they request concerning the present and past physical condition of myself, my spouse, and any of my children".

I

We hold that any delay in processing the Cartwright application was, as a matter of law, reasonable and that the Court of Appeals holding to the contrary was clearly erroneous. The theory of unreasonable delay is based upon an implied acceptance of the application of insurance. Acceptance on the part of the insurer may be implied where it accepts and retains an advance premium while delaying action on the application under

circumstances inconsistent with rejection of the risk.[3]

The undisputed facts regarding processing of the Cartwright application are as follows: the application was received at defendant's home office on November 10, 1969. The following day, defendant received a report from the Medical Information Bureau indicating that Clayton J. Cartwright had been reported as having collagen disease, abnormal heart, and albuminuria. On November 13, defendant forwarded a request for attending physician's statement to Dr. Appleman whom Mr. Cartwright had listed on the application. Thereafter, defendant's file reflects several communications with the Retail Credit Bureau between November 14 and December 1 regarding an erroneous entry in the bureau's report that Mr. Cartwright engaged in a hazardous sport. On December 5, a second request for attending physician's statement was hand-delivered to Dr. Appleman because he had not answered the first. On December 18, Mr. Cartwright died. The following day, defendant wrote to its agent advising that it was still waiting for Dr. Appleman's report. On December 23, defendant learned of Mr. Cartwright's death. On January 6, 1970, defendant wrote to Dr. Appleman in part as follows:

"On November 13 we sent you a signed authorization from Mr. Cartwright requesting that you give us the details of your consultations for the past 5 years. We are attaching another copy of his authorization completed at the time of our application. A second request was sent to you and we re-sent the request on December 5 because our agent indicated you had not received our original requests.

[3] *Gorham v Peerless Life Ins Co,* 368 Mich 335, 341; 118 NW2d 306 (1962). Anno, *Rights and Remedies Arising Out of Delay in Passing Upon Application for Insurance,* 32 ALR2d 487.

"We have recently been informed that Mr. Cartwright is deceased and it is essential that we have your report so that we may determine whether or not we have any liability under his application for insurance.

"Our Conditional Receipt states that, if Mr. Cartwright was insurable on any basis at time of application, his beneficiary has monies due her.

"In order for us to evaluate Mr. Cartwright's insurability, your report is necessary. Doctor, I request your fullest cooperation in assisting us in evaluating Mr. Cartwright's insurability, since without this report we must deny all liability."

On January 12, Dr. Appleman called defendant and gave his report which was recorded, transcribed, and verified by Dr. Appleman at trial. Insofar as the issue of privilege affects the admissibility of this report, it will be discussed in part II, *infra.* This report did detail an extensive and substantial medical history, including collagen disease, rheumatic fever, pneumonia, and albuminuria. In the report, Dr. Appleman stated the following regarding his delay in answering:

"He developed a greater rash on his face in September of 69 and the thought of a possible systemic lupus erythematosus became fixed in my mind. This was the reason why I did not feel I should report the situation to the insurance company at the time I received request for information determining my patient's eligibility for insurance."

Based on this report, defendant determined that Mr. Cartwright was uninsurable as of the date of his application. Mrs. Cartwright was so informed by letter on January 16, in which a refund check for the advance premium was enclosed.

An autopsy revealed that Mr. Cartwright died of severe pneumonia, and that he did have systemic

lupus erythematosus. Lupus erythematosus is a progressive and degenerating disease of the body's connective tissue affecting every system and organ. Its symptoms include fever, pleurisy, arthritis resembling rheumatoid arthritis, skin lesions on the upper body and extremities, leukemia, and inflammation of the heart lining. According to the testimony at trial of defendant's director of underwriting, presence of the disease requires an absolute declination of insurance. The underwriting manual used by defendant is to the same effect.

The Court of Appeals found that the jury could infer unreasonable delay from the 73-day period between application and rejection. However, inclusion of the time period subsequent to death was error since there could have been no detrimental reliance or prejudice from any delay in processing the application after the death of the proposed insured.[4] Furthermore, we find the record uncontradicted that the "delay" in processing the Cartwright application was solely attributable to the avoidance by the insured's attending physician of the repeated requests for medical information. On the facts as enumerated above, reasonable minds could not differ on the conclusion that defendant's actions did not constitute unreasonable delay. The trial court did not err in removing the issue from the jury's consideration.

## II

Relying on *Wohlfeil v Bankers Life Co,* 296 Mich 310, 320; 296 NW 269 (1941), and *Gilchrist v Mystic Workers,* 188 Mich 466; 154 NW 575 (1915), the Court of Appeals found reversible error in the admission over plaintiff's claim of privilege of the

---

[4] *See* Anno, *supra,* 32 ALR2d at 501, "Material Period".

transcript of Dr. Appleman's report to Maccabees.
The Court of Appeals held that Mr. Cartwright's
authorization of his physician to give Maccabees
any information requested concerning present or
past physical condition did not constitute a waiver
of the right to invoke the privilege at trial. Re-
garding this holding, Judge QUINN in dissent
wrote:

"The effect of the majority's non-waiver holding is
that the medical authorization permits the insurance
company to obtain medical information it needs to
determine whether or not to issue a policy of insurance
but this same information cannot be used to explain
why the insurance was not issued. This offends reason.
If that is the law, it is further basis for the ancient
saying, 'The law is an ass'." 65 Mich App at 685.

The holding that the waiver in the application
did not extend to trial does not, however, address
the issue of the consequences to plaintiff of claim-
ing the privilege. In 1957, some 16 years after
*Wohlfeil,* the Legislature amended MCLA
500.2218; MSA 24.12218 by adding four para-
graphs to this section of The Insurance Code. The
original section required that a misrepresentation
in an application for insurance be material before
it can void a policy. The added paragraphs defined
misrepresentation and established procedures for
determining whether it is admissible and material.
MCLA 500.2218(4); MSA 24.12218(4) provides as
follows:

"A misrepresentation that an applicant for life, acci-
dent or health insurance has not had previous medical
treatment, consultation or observation, or has not had
previous treatment or care in a hospital or other like
institution, shall be deemed for the purpose of deter-
mining its materiality, a misrepresentation that the
applicant has not had the disease, ailment or other

medical impairment for which such treatment or care was given or which was discovered by any licensed medical practitioner as a result of such consultation or observation. *If in any action to rescind any contract or to recover thereon, any misrepresentation is proved by the insurer, and the insured or any other person having or claiming a right under the contract, shall prevent full disclosure and proof of the nature of the medical impairment, the misrepresentation shall be presumed to have been material.*"

In the instant case, the insurer introduced substantial evidence of specific and grossly inaccurate representations in the Cartwright application. Not only can there be no disagreement among reasonable men that these false statements would materially affect the acceptance of the risk by defendant, but also they are presumed material by reason of plaintiff's invocation of the privilege to prevent full disclosure to the jury of the extent of Mr. Cartwright's medical impairment. Here, the jury's verdict might well have been directed[5] upon defendant's motion which was timely made.

The trial court's judgment in favor of defendant Maccabees must be reinstated. The Court of Appeals is reversed.

KAVANAGH, C. J., and LEVIN, COLEMAN, LINDEMER, and RYAN, JJ., concurred with FITZGERALD, J.

WILLIAMS, J., took no part in the decision of this case.

---

[5] *Housour v Prudential Life Ins Co of America,* 1 Mich App 455; 136 NW2d 689 (1965); *Dedic v Prudential Ins Co of America,* 14 Mich App 274; 165 NW2d 295 (1968); *Dick v John Hancock Mutual Life Ins Co,* 434 F2d 808 (CA 6, 1970). *Cf. Simonson v Michigan Life Ins Co,* 37 Mich App 79; 194 NW2d 446 (1971), which dealt with an obviously visible physical impairment in the context of a general "sound health" clause, rather than inaccurate answers to specific questions regarding various illnesses and medical tests.